## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

CHAZANTINE GRIFFIN,
  *Plaintiff,*

  v.                                        No. 3:23-cv-1590 (OAW)

MARISSA BARROGA, et al.,
  *Defendants.*

## <u>INITIAL REVIEW ORDER</u>

The plaintiff, Chazantine Griffin, is a *pro se* inmate in the custody of the Department of Correction ("DOC").[1]  ECF No.  Plaintiff has filed a complaint under 42 U.S.C. § 1983 against twenty-three defendants: Marissa Barroga, Debra Cruz, RN Julie Leschinsky, Dr. Frank Maletz, APRN Karen Grande, Dr. Joel Ferreira, Dr. Matthew Shuman, RN Melissa Brown, Dr. Colin Pavano, Dr. Christopher Antonacci, RN Eileen Pereda, Dr. Douglas Gibson, Dr. Vincent Williams, APRN Deborah Broadley, LPN David Reendeau, APRN Kelly DeForest, Dr. Richard Williams, LPN Crista Brennan, Dr. Nicholas Bellas, Dr. Raider, RN Kara Phillips, RN Carly McGregor, and the University of Connecticut Health Medical Center ("UConn").[2]  He asserts a violation of his constitutional rights due to indifference to his medical needs, and he seeks individual and official capacity relief.

---

[1] The court may "take judicial notice of relevant matters of public record."  *Giraldo v. Kessler*, 694 F.3d 161, 164 (2d Cir. 2012).  The publicly available information on the Connecticut DOC website shows that Plaintiff was sentenced on February 15, 2022.  *See*  "Connecticut State Department of Correction: Inmate Information," available at http://www.ctinmateinfo.state.ct.us/detailsupv.asp?id_inmt_num=410396 (last visited June 5, 2024).

[2] Plaintiff does not list all of the defendants in the case caption. Rule 10 of the Federal Rules of Civil Procedure states that "[t]he title of the complaint must name all the parties."  Fed. R. Civ. P. 10(a).  A court may find a *pro se* complaint to sufficiently plead claims against a defendant not named in the caption when there are adequate factual allegations to establish that the plaintiff intended that individual to be a defendant.  *See Imperato v. Otsego County Sheriff's Depart.*, 2016 WL 1466545, at *26 (N.D.N.Y. April 14, 2016) (citation omitted).  Thus, the court considers whether Plaintiff has alleged sufficient facts to state any plausible claims against the defendants named in his list of parties.

The Prison Litigation Reform Act ("PLRA") requires that federal courts review complaints brought by prisoners seeking relief against a governmental entity or officer or employee of a governmental entity. 28 U.S.C. § 1915A(a).  Upon review, the court must dismiss the complaint, or any portion of the complaint, that is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. §§ 1915(e)(2)(B), 1915A(b).

The court has thoroughly reviewed all factual allegations in the complaint and conducted an initial review of the allegations therein in accordance with the PLRA.

## I.   **Allegations**[3]

The court does not include each allegation from the complaint but summarizes the facts to provide sufficient context for this initial review.

This case arises from an injury to Plaintiff's left pinky finger that he says both DOC medical staff and UConn medical staff failed to treat or treated improperly, resulting in the amputation of the finger entirely.

Plaintiff's allegations begin in December 2021, when he reported to medical staff that he had a broken or fractured finger that had not healed properly.[4]  In March 2022, he reported to medical staff that the injury was causing him chronic pain and that he wanted treatment for the pain.   In April 2022, he reported numbness, chronic pain, and a sensation of pins-and-needles in his finger.  Dr. Maletz, a DOC orthopedist, advised him

---

[3] All factual allegations are drawn from the complaint and considered to be true.
[4] Plaintiff alleges that he incurred this injury during his arrest as a result of excessive force, and that the arresting police department did not provide medical treatment for it.  He notes that he has a separate civil rights suit currently pending for those alleged constitutional violations, but he does not appear to state any claims in this action relating to any activity prior to March 2022, at which point he had been sentenced. Accordingly, the court finds that there are no pre-sentence detention claims asserted in this complaint.

that he needed surgery to reconstruct his finger. That month, Plaintiff filed a medical grievance about his pain, injury, and inadequate treatment. He was advised by RN Cruz that he would have a surgical consult in July 2022.

In May 2022, Plaintiff reported that he had severe, persistent pain that was not alleviated by his medication. RN Cruz responded that no further treatment—other than the cream that he had already received—would be provided. In June 2022, Plaintiff was seen by the medical unit and was referred to Dr. Maletz.

On June 24, 2022, Plaintiff went to UConn for X-rays and was advised that surgery was necessary for his injury. In July 2022, Plaintiff discussed surgery for his hand with physicians at UConn. He asked about measures less extreme than surgery, but he was ignored by the physician, Dr. Vincent Williams.

In August 2022, he reported to the medical staff that he was in severe pain. The medical staff advised him to report any emergency to correctional staff so that they could call the medical unit.

In October 2022, Plaintiff reported that he experienced chronic pain in his left hand. RN Cruz advised him that UConn had rescheduled his surgery twice for reasons out of DOC's control. The surgery was supposed to take place in June or July 2022.

In January 2023, Plaintiff finally went to UConn for surgery. Dr. Ferreira and Dr. Schuman performed the surgery, which involved having metal rods and/or screws placed in his finger, but the hardware made Plaintiff's pain worse. Dr. Vincent Williams, a UConn doctor who was aware of Plaintiff's risk of infection while in DOC custody, later signed a document in February 2023 stating that he agreed with Dr. Shuman and Dr. Ferreira's decisions and post-operative instructions.

3

Dr. Reendeau saw Plaintiff when he returned from UConn after his surgery and was advised of UConn's instructions to prevent infections and to protect Plaintiff's cast from water exposure with a covering, but he failed to notify Cheshire medical staff of Plaintiff's daily medical care. Plaintiff developed an infection at the surgical site.

In February 2023, APRN Broadley documented Plaintiff's infection. She was aware of the instructions for Plaintiff's daily post-operation care and that Cheshire medical staff was not providing Plaintiff with this daily care, despite his high risk of exposure to the germs in the DOC facilities. That same month, Plaintiff returned to UConn to have his stiches taken out and he was provided with antibiotics and an adjustable cast. UConn medical staff advised him that his finger, which was swollen and painful, was not healing correctly; they assured him that Cheshire medical staff would do daily checks.

Dr. Bellas saw Plaintiff at a post-operative appointment at UConn. He drained Plaintiff's infected finger and recommended twice daily antibiotics until a follow-up appointment. Although Plaintiff informed Dr. Bellas that DOC staff was not monitoring his finger condition as instructed in the post operation instructions, Dr. Bellas failed to take measures such as noting the failure in Plaintiff's medical record or giving further instructions to DOC staff.

Dr. Pavano saw Plaintiff about his finger at a follow-up medical appointment at UConn. Plaintiff informed him that his splint was getting wet, but Cheshire staff failed to change it. Dr. Pavano was aware of the abscesses on Plaintiff's finger but failed to provide adequate medical care to prevent the spread of infection and permanent injury.

In February 2023, Dr. Richard Williams, a DOC medical provider, knew that Plaintiff had been prescribed multiple antibiotics and that he was subject to infection from

4

germs while in DOC custody.  He indicated that Plaintiff should "return for any new or worsening symptoms."  Plaintiff did return for worsening symptoms, but Dr. Williams failed to identify the infection and instead falsely reported that Plaintiff was non-compliant and had refused treatment.

Plaintiff also saw LPN Brennan for his painful, infected finger.  He informed her that his splint needed changing as it had gotten wet and dirty.  She responded that this was not her problem and that he should not get his splint dirty.  After looking at Plaintiff's infected finger, LPN Brennan gave him a band aid and a high dose of Bactrim.  She later told him to stop refusing treatment.

In March 2023, Plaintiff again went to the Cheshire medical unit because his hand was painful and was not healing correctly.  Dr. Pereda informed him that that his body was rejecting the screws.  She cleaned his wound and provided him with band aids.  She informed him that he had been scheduled to return to UConn the prior month.

Dr. Richard Williams checked Plaintiff's finger, which was oozing a green-yellow puss, and reported that the post-operation infection looked resolved.  He stated that there was no evidence of infection and that the open wound area on Plaintiff's finger was only superficial, despite the drainage.  He continued to report Plaintiff as non-compliant and refusing medical care.  Dr. Williams also provided an X-ray for Plaintiff's finger which showed significant soft tissue swelling and loss of bone tissue around the joint space.

Dr. Gibson signed off on Plaintiff's X-rays, which indicated the presence of infection, but he failed to provide Plaintiff with adequate medical care to prevent the loss of Plaintiff's finger.

When Plaintiff went to the medical unit at Cheshire because his finger was bleeding and infected, RN Cruz stated that it was not infected and wiped off the finger and provided a band aid.  After Plaintiff filed a health care grievance, RN Cruz advised him that the surgeons had postponed his surgery twice.  Plaintiff filed another health care grievance about his infection but never received a response.

In February and March 2023, Plaintiff wrote numerous sick call requests and grievances for medical care that either did not receive timely responses or were ignored.

In April 2023, Plaintiff saw Dr. Pereda again.  At this appointment, Plaintiff showed her his infected finger with its green-yellow drainage and complained that his finger would not heal.  Dr. Pereda provided him with a band aid but could not tell him when he would return to UConn.  Plaintiff claims Dr. Pereda failed to take measures to prevent Plaintiff's permanent injury.

After his transfer to a different facility in April 2023, Plaintiff was seen by RNs Julie Leschinsky and Melissa Brown, who looked at his swollen finger, still discharging green-yellow puss. They provided him with a band aid.  Dr. Maletz reviewed Plaintiff's chart and stated that Plaintiff did not have an infection or symptoms of an infection.

Plaintiff also saw APRN DeForest and advised her about scheduling a UConn visit due to his post-operative complications; specifically, he complained of pain, and that his finger was not healing. She refused his requests for treatment of these conditions.

In April and/or May 2023, APRN Grande looked at Plaintiff's finger, provided him with band aids, and then departed.  Dr. Maletz prescribed daily wraps for his finger and silver nitrate because (as Plaintiff had asserted for months) the finger was not healing and was infected.  RN Phillips was made aware of the wound care ordered by Dr. Maletz.

Dr. Maletz informed Plaintiff that Defendant Barroga scheduled inmate trips to UConn, and that he was scheduled to return, though Dr. Maletz did not recommend the return visit, concluding that his finger injury could be managed on site.  Defendant Barroga knew Plaintiff needed to return to UConn, but she delayed acting upon his requests until it was too late.

In May 2023, RN Leschinsky and RN Brown both came to see Plaintiff for his swollen and infected finger.  RN Leschinsky provided a patch treatment using band aids.  Neither the silver nitrate nor the band aids worked to cure Plaintiff's infected finger.  Plaintiff reported his pain level at nine, but RN Brown failed to note that.

In June 2023, APRN Grande prescribed medication for Plaintiff and swabbed his finger.  She sent fluid from his infected finger for testing.  Plaintiff wrote a health care grievance, as his finger had reoccurring infections and had not healed for almost six months. Later in June, Plaintiff returned to UConn, where more X-rays were provided; Dr. Antonacci advised him that the infection was "eating" at his finger bone.  He cautioned that amputation may be required to prevent spread of the infection.

In July 2023, Plaintiff had several visits to UConn.  At one, he had an MRI.  At another, Dr. Antonacci informed him that amputation was necessary due to osteomyelitis, an infection that could spread to other joints and bones and become septic.  He also explained that the amputation could have been avoided had Cheshire medical staff provided the recommended follow-up treatment.  Plaintiff claims that Dr. Antonacci failed to provide him with any pain medication despite his complaints of pain.

In August 2023, Plaintiff received his medical records, which indicated that, in April 2023, Dr. Richard Williams and LPRN Brennan falsified a document from February 2023

(when UConn had wanted Plaintiff to return), stating that he had refused treatment. Plaintiff asserts that Dr. Williams and LPN Brennan caused a delay in his medical treatment by barring his access to specialists, and that they falsified his medical record to cover up their failure to provide adequate medical treatment post-operation.

In October 2023, Plaintiff requested to see medical staff for extreme pain. He was seen by Dr. Grande, who stated: "You're only losing a finger. You'll be just fine."

In November 2023, Plaintiff had his finger amputated at UConn by Dr. Ferreira. After completing the amputation surgery, Dr. Ferreira failed to provide Plaintiff with pain medication despite Plaintiff's complaints of extreme pain. Plaintiff saw APRN Grande the same day as his surgery and requested monitoring of the surgical site to prevent infection from recurring. He also reported difficulty wrapping his cast. APRN Grande told him to take responsibility to protect his cast from moisture and dirt. She failed to document that Plaintiff was an amputee, failed to place him in the infirmary, and refused to provide him with a bottom bunk pass.

On November 15, 2023, Plaintiff was in the facility infirmary for a day. Dr. Raider informed him that he could not stay longer because the infirmary was only for sick people. He ignored Plaintiff's concerns about his risk of further infection after his amputation, although he permitted Plaintiff to take showers in the infirmary three days a week, the same schedule as provided for inmates in segregation. He asked Dr. Raider why he was being punished for losing a limb and queried why he could not take his daily shower in the infirmary as there were other amputees in the infirmary. Dr. Raider stated that Plaintiff would be fine as he was not sick and had only had his pinky amputated. Dr. Raider ignored the fact that Plaintiff—as a recent amputee—would not be able to protect himself

from violence that he could encounter while in the general population.  On that same day, Plaintiff informed a nurse that his Oxycontin prescription was not strong enough to help with his pain, and that Drs. Raider and APRN Grande had ignored his request for medication to relieve his extreme pain.

On November 19, 2023, medical staff were called to Plaintiff because he had excruciating pain in his hand.  He informed the medical staff that his hand felt like it was bleeding and that his hand wrap hadn't been changed since November 14, 2023. He asked RN Phillips why he could not stay in the infirmary and asserted that he needed stronger medication for pain.  She explained that she could not change his wraps per the orders of Drs. Raider and APRN Grande, and that she could only provide him with Tylenol.

On November 23, 2023, Correction Officer Lamere did not "pop" Plaintiff's cell for his morning medication.  Plaintiff informed Officer Lamere that he was in extreme pain. Officer Lamere responded that it was Plaintiff's responsibility to hit the button and that it was not his fault.  Later that day, Plaintiff went to the afternoon medication line and informed Nurse Carly McGregor that he was in severe pain as he had missed his morning dose.  She told Plaintiff that it was his responsibility to be up at that time.

On November 24, 2023, Plaintiff was seen by APRN Grande for a post-operative appointment.  Plaintiff requested to be placed in the infirmary for daily monitoring, but she indicated that Plaintiff was responsible for protecting his cast from water and dirt.

 The next day, Plaintiff was seen by RN Phillips for a routine check-up after his return from UConn Medical Center.  He informed her that he was in extreme pain and wanted to take the pain medication that had not been provided in the afternoon.  RN

Phillips took his vital signs but still refused to provide him with pain medication (despite his high blood pressure).

Sometime in November 2023, Dr. Raider responded to Plaintiff's inmate request seeking adequate medical treatment for his amputation.  Dr. Raider stated that his issue was "not a nursing/medical issue but rather something as an adult [Plaintiff] should be quite capable of."  Plaintiff has previously expressed his difficulty keeping his bandages dry in his dirty, humid, and wet prison environment within which he is detained.

II.   **DISCUSSION**

Section 1983 "provides a private right of action against any person who, acting under color of state law, causes another person to be subjected to the deprivation of rights under the Constitution or federal law."  *Blyden v. Mancusi*, 186 F.3d 252, 264 (2d Cir. 1999). Plaintiff claims that all the defendants have violated his Eighth Amendment rights, and that Dr. Richard Williams and LPN Brennan have violated his First Amendment rights.

As an initial matter, Plaintiff cannot assert any plausible claim under § 1983 against UConn because no state, state agency, or division thereof is a "person" subject to suit under 42 U.S.C. § 1983.  *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989) (holding that § 1983 cannot proceed against states and agencies that are arms of the states); *Blaine v. UConn Health Care*, No. 3:18-CV-359 (MPS), 2018 WL 1368909, at *2 (D. Conn. Mar. 16, 2018) (dismissing clam against a University of Connecticut healthcare office because it is a division of a state agency, and not "person" subject to suit).

Accordingly, the court considers whether Plaintiff has alleged any plausible claims

for damages against the defendants in their individual capacities.  Plaintiff must allege facts to reflect that any defendant against whom he seeks damages was personally involved in the alleged constitutional violation.  *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) ("[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.") (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir.1991)).  As the United States Court of Appeals for the Second Circuit has clarified, "there is no special rule for supervisory liability."  *Tangreti v. Bachman*, 983 F.3d 609, 618 (2d Cir. 2020).  Thus, a plaintiff must plead and prove the elements of the underlying constitutional violation directly against a state official without relying on a special test for supervisory liability.  *Id.* at 620.

## A.   Eighth Amendment

The Eighth Amendment protects prisoners from the unnecessary infliction of pain, which includes "deliberate indifference to serious medical needs of prisoners."  *Estelle v. Gamble,* 429 U.S. 97, 104 (1976).  To state a claim for deliberate indifference to a serious medical need, a plaintiff's claim must satisfy both an objective and a subjective element. *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994).  First, the alleged deprivation must be objectively serious.  *Id.*  Second, the charged official must act with a sufficiently culpable state of mind."  *Id.*

To determine whether the objective prong is satisfied, courts will look to factors such as whether "a reasonable doctor or patient would find [it] important and worthy of comment or treatment," whether the condition "significantly affects an individual's daily activities," and whether it causes "chronic and substantial pain." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (quoting *McGuckin v. Smith*, 974 F.2d 1050, 1059–60

(9th Cir.1992)).  Moreover, "the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate." *Helling v. McKinney*, 509 U.S. 25, 36 (1993).

The court accepts at this point in litigation that Plaintiff's injuries were serious under this standard.  His assertions of pain attributed to his broken finger are adequate for purposes of initial review, and his subsequent infection, which also caused chronic pain and which ultimately required amputation to treat, similarly qualifies as objectively serious.

To satisfy the subjective prong, it must be alleged that a defendant actually was aware of a substantial risk that Plaintiff would suffer serious harm due to such defendant's actions or inactions.  *See Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006).  "[M]ere medical malpractice is not tantamount to deliberate indifference," unless "the malpractice involves culpable recklessness, i.e., an act or failure to act . . . that evinces a conscious disregard of a substantial risk of serious harm." *Chance*, 143 F.3d at 703 (quoting *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir.1996)).  Further, "mere disagreement over the proper treatment does not create a constitutional claim," and "[s]o long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Id.*  "Whether a course of treatment was the product of sound medical judgment, negligence, or deliberate indifference depends on the facts of the case." *Id*.

1.   <u>March 2022 through January 2023</u>

During this period, Plaintiff had reported to DOC medical staff that his finger was broken and was not healing properly.  The next month he saw the orthopedist, Dr. Maletz, who advised that surgery would be necessary.  He was seen at UConn two months after

that, and was scheduled for surgery shortly thereafter, but UConn rescheduled the surgery twice, until the surgery finally was performed in January 2023.  The court finds that this timeline does not give rise to any inference of deliberate indifference.  To the contrary, it appears that DOC was addressing the issue in a timely fashion, but was reliant upon UConn's availability.  And there does not appear to be any nefarious reason that UConn rescheduled the surgery; unfortunately, modern medicine is not always swift, particularly in the aftermath of a pandemic.

Moreover, the court finds that RN Cruz's provision of a cream to relieve Plaintiff's pain, but nothing more, amounts to a disagreement in medical judgment, which, by itself, cannot stand as the basis for a deliberate indifference claim.  *See Chance*, 143 F.3d at 703; *Hill v. Curcione*, 657 F.3d 116, 123 (2d Cir. 2011) (finding that a prisoner's claim that provision of Motrin was insufficient and that he required stronger pain medication did not state a claim of deliberate indifference).

Accordingly, the court finds that Plaintiff has failed to state any claim for deliberate indifference based on the defendants' conduct prior to his first surgery.

2. <u>Plaintiff's First Surgery</u>

While Plaintiff alleges that the UConn doctors "botched" his surgery, the allegations against Dr. Ferreira, Dr. Shuman, and Dr. Williams dot not show that they acted with deliberate indifference to his medical needs.  Assuming that the UConn doctors were acting under color of state law when they performed Plaintiff's first surgery, Plaintiff has failed to show any of these defendants acted with the requisite culpable state of mind.  Plaintiff alleges that Drs. Ferreira and Schuman placed metal rods or screws in his finger that exacerbated his pain and Dr. Williams ignored his questions about alternative

13

measures and agreed with Dr. Ferreira and Dr. Schuman.  But his allegations indicate only his disagreement with their medical judgment, or at most medical malpractice, which does not support a constitutional violation.  *See Chance*, 143 F.3d at 703.

Accordingly, Plaintiff has failed to state any § 1983 claim in connection with his first surgery itself.

3.  January 2023 through November 2023

Plaintiff alleges that after his first surgery, he developed osteomyelitis because of the deliberate indifference of RN Leschinsky, RN Brown, Dr. Maletz, APRN Grande, APRN Broadley, Dr. Reendeau, APRN Deforest, Dr. Richard Williams, LPN Brennan, RN Cruz, Dr. Pereda, Dr. Gibson, and Defendant Barroga.  For purposes of initial pleading, Plaintiff's allegations adequately suggest that these defendants acted with deliberate indifference to his serious medical needs for his finger infection prior to his amputation surgery.[5]  He asserts that for months, these defendants failed to properly follow the surgeons' instructions regarding post-operative care.  And then, when Plaintiff showed signs of contracting an infection, they ignored or downplayed his symptoms.  This is adequate to satisfy the subjective element with respect to these defendants.

Plaintiff also asserts a deliberate indifference claim against Dr. Antonacci, Dr. Pavano, and Dr. Bellas, but it is not clear that either acted with deliberate indifference.  With respect to Dr. Antonacci, Plaintiff alleges that he failed to give Plaintiff any

---

[5] Plaintiff has not, however, alleged facts to suggest that RN Cruz acted with deliberate indifference to his medical needs in connection with her responses to his inmate requests or grievances.  To the extent Plaintiff filed a grievance that was not answered, he cannot allege a plausible constitutional violation based on any defendant's alleged failure to respond to his administrative complaint. "[A]s a matter of law, a defendant's mere 'receipt of a letter or grievance, without personally investigating or acting [thereon], is insufficient to establish personal involvement.'" *Alvarado v. Westchester Cnty.*, 22 F. Supp. 3d 208, 215 (S.D.N.Y. 2014) (quoting *Burns v. Fischer*, 2014 WL 1413387, at *5 (W.D.N.Y. Feb. 3, 2014)) (second alteration in original).

medication to address his extreme pain and he determined Plaintiff's finger needed to be amputated, which Plaintiff felt was extreme.  With respect to Dr. Pavano, Plaintiff asserts that he failed to identify his infection and failed to tell DOC to attend Plaintiff more diligently.  And with respect to Dr. Bellas, Plaintiff alleges that he did recognize that Plaintiff's finger was infected, and he did prescribe antibiotics, but not the correct one. He also faults Dr. Bellas for not making note of DOC's failure to follow post-surgical care instructions and for not telling DOC staff to be more attentive to him.  But none of these allegations shows a conscious disregard to Plaintiff's medical needs.  Recommending amputation and prescribing antibiotics clearly are matters of medical judgment, and the court will not second-guess a medical professional's prognosis absent more facts than are alleged here.  Even assuming Dr. Pavano missed the diagnosis of Plaintiff's infection, that is at best medical malpractice, which is insufficient to carry an Eighth Amendment claim.  The doctors' failure to attempt to direct DOC to mind Plaintiff's finger more closely also cannot satisfy the subjective element of a deliberate indifference claim; there is no evidence that they should have known harm would come to Plaintiff absent such action. And it is not clear to the court what Dr. Antonacci did or did not do with respect to pain medication.  If Plaintiff expected to be given medication directly from the doctor at the time of his appointment, that alone cannot carry his claim, particularly when reviewed in concert with other allegations in the complaint.  Plaintiff repeatedly references pain medicine that he was receiving regularly.  There was a cream he was given before his surgeries, and it appears he was being given Oxytocin after his surgeries, and he also was permitted Tylenol.  So, this does not appear to be a case where a prisoner was given no pain medication at all.  Rather, this situation seems almost identical to that of *Hill,* 657

F.3d 116, where a court held that a litigant was not entitled to stronger pain medication. Accordingly, the court finds that Plaintiff has failed to state a claim against the UConn doctors.

Plaintiff also names RN Phillips as a defendant to this claim, but his only allegation about her conduct prior to his amputation is that she signed off on his wound care instructions.  Plaintiff asserts in conclusory terms that she was aware of his substantial risk of harm, but he has not alleged facts to show that she acted with conscious disregard to his medical needs relevant to his infection.  Accordingly, Plaintiff has not alleged a plausible Eighth Amendment claim based on RN Phillips' conduct prior to his amputation.

In sum, the court permits Plaintiff to proceed on his individual-capacity Eighth Amendment claims for damages arising from the acts and omissions after his first surgery of RN Leschinsky, RN Brown, Dr. Maletz, APRN Grande, APRN Broadley, Dr. Reendeau, APRN Deforest, Dr. Richard Williams, LPN Brennan, RN Cruz, Dr. Pereda, Dr. Gibson, and Defendant Barroga.

      4.    <u>Plaintiff's Second Surgery: Amputation</u>

Relevant to the amputation of his finger, Plaintiff alleges only that it was performed by Dr. Ferreira.  He does not allege facts suggesting that Dr. Ferreira acted with conscious disregard to his medical needs when he performed Plaintiff's second surgery. Accordingly, Plaintiff has not alleged a plausible claim against Dr. Ferreira arising from the amputation itself.

5.   Post-Amputation Treatment

Plaintiff alleges that, after his amputation, Dr. Ferreira, RN Phillips, RN McGregor, Dr. Raider, and APRN Grande failed to provide him with adequate pain medication and time in the infirmary to protect him from infection and other inmates while healing.

The court finds these allegations inadequate to state a plausible Eighth Amendment deliberate indifference claim.  For the reasons discussed above, the failure to provide as much pain medication as Plaintiff requested is not an adequate basis for a deliberate indifference claim.  And refusal to allow Plaintiff to stay in the infirmary does not indicate that the defendants were aware of a risk of harm that they failed to address. It does not appear that Plaintiff was in any specific danger from other prisoners; indeed, he was equally vulnerable prior to his second surgery but there is no allegation that he was harmed by other inmates.  And it is implausible that whether or not Plaintiff was housed in the infirmary would be dispositive of his vulnerability to infection.

Accordingly, Plaintiff has failed to state a plausible Eighth Amendment claim for his treatment after his second surgery.

4.   Falsification of Medical Record

Plaintiff asserts that Dr. Richard Williams and LPN Brennan falsified records to cover up their failure to provide adequate medical treatment and to delay his medical treatment by barring his access to specialists.

Research reveals that district courts generally have declined to find that false reporting alone gives rise to an independent constitutional claim under Section 1983. *Porter v. Bunch*, No. 16-CV-5935 (KMK), 2019 WL 1428431, at *10 (S.D.N.Y. Mar. 29, 2019) (dismissing a deliberate indifference claim based, in part, on the plaintiff's assertion

that a nurse failed to accurately record medical notes); *Bloomfield v. Wurzberger*, No. 9:08-CV-619 (GLS/RFT), 2009 WL 3335892, at *5 (N.D.N.Y. Oct. 15, 2009) ("The filing of a false entry in medical records, without more, does not constitute a constitutional violation."). However, falsification of a medical record may support an inference of deliberate indifference to medical needs.  *See Ruggiero v. Canfield*, No. 14-CV-00307 (LF), 2017 WL 9485692, at *15 (W.D.N.Y. Mar. 23, 2017), *report and recommendation adopted*, No. 14-CV-307 (RJA), 2017 WL 5152178 (W.D.N.Y. Nov. 7, 2017) (noting that discrepancies in the medical record could be construed as attempts to minimize the serious nature of plaintiff's lump, leading to denial of biopsy referral); *White v. Clement*, 116 F. Supp. 3d 183, 188-89 (W.D.N.Y. 2015) (finding that failure to document the plaintiff's serious side effects to prescribed medication, such that medication was not discontinued, could constitute deliberate indifference to serious medical need).

Here, Plaintiff claims that these defendants falsified his medical records to indicate that he refused treatment in February 2023, and that this action was intended to cover up their misconduct and to delay his access to specialists.  At this point in litigation it is unclear whether this allegation is sufficient to state a stand-alone claim, but the court will allow it to proceed against Dr. Richard Williams and LPN Brennan for further argument.

### B.   First Amendment Retaliation

Plaintiff asserts that the alleged falsification of his medical records also was retaliation that violates the First Amendment.

To plead a First Amendment retaliation claim, an inmate must plausibly allege "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the

protected speech and the adverse action." *Brandon v. Kinter*, 938 F.3d 21, 40 (2d Cir. 2019) (quoting *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004)) (internal quotation marks omitted). The United States Court of Appeals for the Second Circuit has "instructed district courts to 'approach prisoner retaliation claims with skepticism and particular care, because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act.'" *Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015) (quoting *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir.2003)) (internal quotation marks omitted). As such, the Second Circuit has required prisoners asserting retaliation claims to make specific and detailed factual allegations, not conclusory accusations. *Id.*

Plaintiff plainly can satisfy the first element because he engaged in protected activity by filing prison grievances. *See Baltas v. Maiga*, No. 3:20cv1177 (MPS), 2020 WL 6275224, at *8 (D. Conn. Oct. 26, 2020) ("Protected speech or activity includes filing a lawsuit, an administrative complaint, or a prison grievance."). And the court will assume, without deciding, that he has also shown an adverse action, which is defined as "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Brandon*, 938 F.3d at 40 (quoting *Davis*, 320 F.3d at 353) (internal quotation marks omitted).

However, Plaintiff does not allege facts sufficient to satisfy the third element: a causal connection between his protected activity and the alleged adverse action. To allege causation, a plaintiff must state facts showing that the protected conduct was a "substantial or motivating factor" precipitating the adverse action. *Harnage v. Brighthaupt*, 168 F. Supp. 3d 400, 412 (D. Conn. 2016), *aff'd*, 720 F. App'x 79 (2d Cir. 2018). Here,

Plaintiff has not alleged specific facts to support an inference that Plaintiff's protected activity had any causal connection to the alleged falsification of his medical record, much less that it was a substantial factor behind the falsification. Consistent with the Second Circuit instruction to approach retaliation claims with some measure of skepticism, the court will not permit Plaintiff to proceed on a retaliation claim based upon his wholly conclusory assertion that these defendants acted with a retaliatory motive.

    **C.**    **Official Capacity Claims**

Plaintiff also seeks relief in the form of (1) a declaratory judgment stating that Defendants have violated his rights in the past; and (2) injunctive orders that he be provided with timely, adequate medical care. Plaintiff cannot recover monetary damages against Defendants in their official capacities because they are state employees, and such claims are barred by the Eleventh Amendment. *Kentucky v. Graham*, 473 U.S. 159, 169 (1985).

Plaintiff may proceed against Defendants in their official capacities only to the extent that he seeks prospective relief for an ongoing violation of federal law. *See Ex parte Young*, 209 U.S. 123, 155-56 (1908); *see also In re Deposit Ins. Agency*, 482 F.3d 612, 617 (2d Cir. 2007) ("[A] plaintiff may sue a state official acting in his official capacity—notwithstanding the Eleventh Amendment—for 'prospective injunctive relief' from violations of federal law."). When a party sues a state official in their official capacity, "a federal court's remedial power, consistent with the Eleventh Amendment, is necessarily limited to prospective injunctive relief and may not include a retroactive award which requires the payment of funds from the state treasury." *Edelman v. Jordan*, 415 U.S. 651, 677 (1974) (internal citation omitted).

Plaintiff's declaratory judgment request is barred, as the Eleventh Amendment "does not permit judgments against state officers declaring that they violated federal law in the past." *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy*, 506 U.S. 139, 146 (1993); *see also Green v. Mansour*, 474 U.S. 64, 71 (1985).  Likewise, Plaintiff's request for injunctive relief based on deliberate indifference to his need for treatment and pain relief for his infected finger prior to amputation is not plausible because these Eighth Amendment violations occurred in the past.  As none of Plaintiff's active claims is premised upon any alleged ongoing violation of his rights, the court will dismiss as not plausible his requests for official capacity relief.

## III.  <u>CONCLUSION</u>

For the foregoing reasons, the case shall proceed on Plaintiff's individual capacity claims for damages for violation of the Eighth Amendment arising from failure to provide adequate medical treatment for his finger to prevent pain and spread of the infection, resulting in amputation, against RN Leschinsky, RN Brown, Dr. Maletz, APRN Grande, APRN Broadley, Dr. Reendeau, APRN Deforest, Dr. Richard Williams, LPN Brennan,  RN Cruz, Dr. Pereda, Dr. Gibson, and Defendant Barroga.

All other claims, including official capacity claims, are DISMISSED.  Defendants Dr. Bellas, Dr. Antonacci, Dr. Pavano, Dr. Ferreira, Dr. Shuman, Dr. Vincent Williams, RN Phillips, Dr. Raider, RN McGregor, and UConn Health Center are DISMISSED from this action.  The Clerk of Court is asked, respectfully, to please terminate these defendants from this action.

Plaintiff has two options as to how to proceed in response to this Initial Review Order:

(1) If he wishes to proceed on the claims that are not dismissed in this order, Plaintiff may do so without further delay.  If Plaintiff selects this option, he shall file a notice on the docket on or before **August 5, 2024,** informing the court that he elects to proceed with service as to the claims set forth in this paragraph.  The court will then begin the effort to serve process on the defendants in their individual capacities.

(2) Alternatively, if Plaintiff wishes to attempt to replead any of the claims asserted in his complaint that have been dismissed (to attempt to state a viable claim), he may file an amended complaint by **August 5, 2024.**  An amended complaint, if filed, will completely replace the original complaint, and the court will no longer consider any allegations made in the original complaint unless they are restated in the amended complaint.  Similarly, the amended complaint must state each named defendant in the caption.  The court will review any timely amended complaint to determine whether it may proceed to service of process on any defendants named therein.  If Plaintiff elects to file an amended complaint, the original complaint this IRO addresses will **not** proceed to service of process on any defendant.

If the court receives no response from Plaintiff by the deadline noted above, the court will presume that Plaintiff wishes to proceed on the complaint as to the claims permitted to go forward in this order, and Plaintiff will have to show good cause if he seeks to amend the complaint in any manner in the future.

**IT IS SO ORDERED** at Hartford, Connecticut, this 6th day of June, 2024.

/s/
OMAR A. WILLIAMS
UNITED STATES DISTRICT JUDGE